## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| H & S READY MIX, INC. ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>                    Plaintiff,<br><br>    v.<br><br>SIKA AG; SIKA CORPORATION; CHRYSO, INC.; GCP APPLIED TECHNOLOGIES, INC.; COMPAGNIE DE SAINT-GOBAIN S.A.; SAINT- GOBAIN NORTH AMERICA; MASTER BUILDERS SOLUTIONS ADMIXTURES U.S., LLC; MASTER BUILDERS SOLUTIONS DEUTSCHLAND GMBH; CINVEN LTD.; CINVEN, INC.; THE EUCLID CHEMICAL COMPANY; RPM INTERNATIONAL INC.; AND DOES 1-10,<br><br>                    Defendants. | **Case No.** _____<br><br>**Jury Trial Demanded** |

## <u>CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

**SUMMARY** ................................................................................................. 3

**JURISDICTION AND VENUE** ....................................................................... 7

**PARTIES** ..................................................................................................... 7

    A.   Plaintiff .................................................................................................. 7

    B.   Defendants ............................................................................................. 8

         1.  *Euclid Group* ................................................................................... 8

         2.  *Master Builders Group* ................................................................. 8

         3.  *Sika* ................................................................................................ 9

         4.  *Saint-Gobain Group* .................................................................. 10

         5.  *Doe Defendants* .......................................................................... 11

    C.   Agents and Unnamed Co-Conspirators ......................................... 11

**FACTUAL ALLEGATIONS** ......................................................................... 12

    A.   Relevant Market .................................................................................. 12

    B.   Market Forces Do Not Explain Defendants' Drastic Price Hikes During the Class Period . 14

    C.   Defendants Common Membership in Trade Organizations Facilitated Their Collusion ............ 18

    D.   Market Conditions for CCAs Are Highly Conducive to Collusion Among Defendants...... 24

         1.  *There are high barriers to entry.* ................................................ 24

         2.  *There is inelastic consumer demand for CCAs.* ...................... 25

         3.  *The market for CCAs manufacturers is highly concentrated.* .......... 25

         4.  *The market of CCA purchasers is unconcentrated.* .................. 27

         5.  *Regular merger activity afforded Defendants opportunities to exchange competitively sensitive information.* ...................................................................... 27

         6.  *There were numerous opportunities for defendants to collude.* ...................... 28

    E.   Antitrust Investigations into Defendants' Conduct Corroborate the Existence of a Conspiracy ................................................................................. 29

    F.   Defendants Fraudulently Concealed Their Conduct ......................... 30

**CLASS ACTION ALLEGATIONS** ............................................................... 31

**INTERSTATE TRADE AND COMMERCE** .................................................. 34

**ANTITRUST INJURY** ................................................................................. 34

**CLAIM** ....................................................................................................... 35

    Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade) ................................................................................. 35

**PRAYER FOR RELIEF** ............................................................................... 37

**JURY DEMAND** ......................................................................................... 38

Plaintiff H & S Ready Mix, Inc. ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demands a trial by jury on all matters so triable.

## SUMMARY

1.          Plaintiff and Class Members bring this suit against Defendants for their unlawful agreement to fix the prices for concrete and cement admixtures (collectively "CCAs"), which include (a) concrete admixtures, (b) cement additives, (c) admixtures for mortar, and (d) products containing or bundled with any of the foregoing. CCAs are additives which, depending on the method of addition, enhance various features of the base material (e.g., time required to set, crack resistance, reduced vulnerability to efflorescence, etc.).

2.          Defendants are Cinven Ltd., and Cinven, Inc. ("Cinven");  Master Builders Solutions Admixtures U.S., LLC, ("MBSA"), under the ownership and control of Master Builders Solutions Deutschland GmbH ("MBSD") (with Cinven, collectively "Master Builders Group"); The Euclid Chemical Company ("Euclid"), under the ownership and control of RPM International Inc. ("RPM," and with Euclid, "Euclid Group"); Sika AG and Sika Corporation (collectively, "Sika"); Chryso, Inc. ("Chryso"); and GCP Applied Technologies, Inc. ("GCP"), under the ownership and control of Compagnie de Saint-Gobain S.A. and Saint-Gobain North America ("Saint-Gobain," and with Chryso and GCP, collectively "Saint-Gobain Group").

3.          Defendants manufacture and sell the vast majority of CCAs sold in the United States. In 2022, the global market for CCAs reached a decade-high at over $20 billion and is expected to continue to grow at 10.4% compounded annually for the next ten years.[1]

---

[1] *Cement Admixtures Market, By Product Type (Normal Plasticizers, Super-plasticizers, Retarding Admixtures,*

4.      Dating back to 2014, market conditions for CCAs created fertile ground for the seeds of collusive price setting: concentrated supply; high barriers to entry, which insulated incumbent suppliers from new market entrants; and unconcentrated, inelastic demand. It was against this backdrop that Compagnie de Saint-Gobain S.A. began buying up Sika AG stock in an attempt to accomplish a hostile takeover.[2] The takeover ultimately failed and, in May 2018, Compagnie de Saint-Gobain S.A. contented itself with just under eleven percent of Sika AG's shares.[3] At that point, the companies' newly-aligned financial interests incentivized them to collusively charge supracompetitive prices for CCAs.

5.      Sika AG and Compagnie de Saint-Gobain, however, were aware that a cartel of just the two producers could not meaningfully impact prices of CCAs. To address this, Sika AG and Compagnie de Saint-Gobain conducted a global campaign of buying up smaller competitors. Assisting in this consolidation spree were Euclid Group and the private equity firm Cinven, both of whom had likewise engaged in consolidating entities in the CCA and adjacent markets.[4] This rapid consolidation of market power increased the effectiveness of Defendants' agreement.

6.      Plaintiffs and Class Members learned of Defendants' conspiracy on October 17, 2023, in the wake of surprise raids carried out by the antitrust agencies of several foreign governments. On October 17, 2023, the United Kingdom's Competition and Markets Authority ("CMA") announced an investigation into suspected anticompetitive conduct among suppliers of "chemical admixtures and additives which are essential input for products

---

*Accelerating Admixtures, and Others), By End-Users (Infrastructure, Commercial, Residential), and By Region (North America, Europe, Asia Pacific, Latin America, and Middle East & Africa) - Trends, Analysis and Forecast till 2032,* Prophecy Market Insights (August, 2023), https://www.prophecymarketinsights.com/market_insight/Cement-Admixtures-Market-5145.

[2] *Sika Management against Saint-Gobain takeover*, Reuters (December 8, 2014), https://www.reuters.com/article/idUSL6N0TS0C8/.

[3] *Sika and Saint-Gobain Settle Bitter Dispute*, SWI-Swiss Broadcasting Corporation (May 11, 2018), https://www.swissinfo.ch/eng/business/chemical-brothers_sika-and-saint-gobain-settle-bitter-dispute/44110816.

[4] *Euclid Chemical Acquires Cement Grinding Aids and Additives Business*, PR Newswire (April 29, 2022) https://www.prnewswire.com/news-releases/euclid-chemical-acquires-cement-grinding-aids-and-additives-business-301536262.html; *Cinven Agrees to acquire MBCC Admixtures*, Cinven  (March 22, 2023), https://www.cinven.com/media/news/cinven-agrees-to-acquire-mbcc-admixtures.

like concrete, mortars, and cement used in the construction industry."[5] The CMA specified that the ongoing investigation pertained to suspected violations of the UK's analog to Section 1 of the Sherman Act, and that the CMA was in contact with other authorities "including the United States Department of Justice, Antitrust Division."[6] That same day, the European Commission ("EC") similarly announced its participation in the investigation, as well as the involvement of the Antitrust Division of the United States' Department of Justice ("DOJ").[7] These various antitrust enforcement agencies have since announced that they are investigating Sika, Saint-Gobain Group, and Master Builders Group; that several conspirators are cooperating with the foreign antitrust authorities; and that Sika is in contact with the DOJ.[8]

7.    Defendants' common membership in domestic and foreign trade organizations provided them ample opportunity to conspire. Some or all of Defendants (or their affiliates) are members of numerous CCA trade associations around the World, including trade associations in Belgium, France, Italy, Norway, Spain, Sweden, Turkey, and the UK. These trade associations have further partnered with the European Federation of Concrete Admixtures Association ("EFCA"), an overarching trade organization whose "membership provides in excess of 80% of admixture sales within Europe and represents all the major

[5] Gov.UK, *CMA Launches Investigation Into the Supply of Chemicals for Use in Construction Industry*, (Oct. 17, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-the-supply-of-chemicals-for-use-in-construction-industry.

[6] *Id.*

[7] *Commission carries out unannounced antitrust inspections in the construction chemicals sector*, European Commission (October 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

[8] *Sika shares slide after EU raids companies over price-fixing suspicions*, Reuters (October 17, 2023), https://www.reuters.com/sustainability/sika-shares-slide-after-eu-inspections-unnamed-chemical-firms-2023-10-17/ (Sika confirmed it is part of investigation for price fixing); *St Gobain see no financial impact from EU construction chemicals cartel probe,* (October 17, 2023) https://www.reuters.com/markets/europe/st-gobain-says-cooperating-eu-probe-into-construction-chemicals-cartel-2023-10-18/ (Saint-Gobain confirmed it was targeted in October 17 raids); *Sika, Saint-Gobain and Cinven-owned business targeted in cross-border cartel probe,* Global Competition Review (October 17, 2023, https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe (Sika, Saint-Gobain, and Master Business Solutions confirming involvement in EU raids).

admixture manufacturers."[9]

8.      In the United States, Defendants are active participants in and sponsors of the National Ready-Mix Concrete Association ("NRMCA").[10] Common membership within the NRMCA provided Defendants with further opportunity to meet and collude among themselves under the guise of legitimate trade association participation.

9.      The NRMCA also provided Defendants with benchmarking analyses that Defendants could misuse to further their efforts to fix CCA prices by giving Defendants access to nearly real-time information on competitively sensitive metrics of their competitors – information which is only made available to participating members of the NRMCA.[11] In a competitive market, this kind of information would allow industry participants to undercut each other on price and steal market share, and would be contrary to a firm's self-interest to share with competitors. But in a cartel, access to this kind of information serves as reassurance that cartel members are adhering to the conspiracy and declining to pursue co-conspirators' market share.  In addition, Defendants Euclid Group, Sika, Saint-Gobain Group, and Master Builders Solutions are also "Sustaining Members" of the American Concrete Institute.[12]

10.     Beginning no later than May 11, 2018, Defendants entered into an agreement to consolidate their control over the global manufacture of CCAs and charge supracompetitive prices for CCAs through price increases and surcharges. This agreement, effectuated at least in part through common trade association membership, resulted in Plaintiff and members of the Class paying supra-competitive prices for CCAs in the United States and its territories. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the

---

[9] *About Us,* European Federation of Concrete Admixtures Associations, (Accessed January 5, 2024), https://www.efca.info/about-us.
[10] *About NRMCA*, National Ready Mix Concrete Association (Accessed January 5, 2024), https://www.nrmca.org.
[11] *Surveys & Benchmarking*, National Ready Mix Concrete Association (accessed January 5, 2024), https://www.nrmca.org/association-resources/nrmca-surveys-benchmarking.
[12] *About ACI,* American Concrete Institute  (accessed January 5, 2024), https://www.concrete.org.

Sherman Act, 15 U.S.C. §§ 1, 3. Through this action, Plaintiff, on behalf of itself and Class

Members, seeks to recover the overcharges they paid to Defendants.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337,

as this action arises out of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and Sections

4 and 16 of the Clayton Act. 15 U.S.C. §§ 15(a), 26. This court further has jurisdiction over

this action pursuant to 28 U.S.C. §1332(d) because this is a class action in which the aggregate

amount in controversy exceeds $5,000,000 and at least one member of the putative class is a

citizen of a state different from that of one of the Defendants.

12.     Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the

Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by Class Members and the

costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive

conduct; and for such other relief as is afforded under the antitrust laws of the United States

and its territories for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C.

§§ 1, 3).

13.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton

Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because,

at all times relevant to the Complaint, one or more of the Defendants resided, transacted

business, was found, or had agents in this District.

## PARTIES

A.      **Plaintiff**

14.     Plaintiff, H & S Redi-Mix, Inc., is a business incorporated in the State of Wisconsin

with its primary place of business at N6200 Cty RD XX, Onalaska, WI 54650.

15.     During the Class Period, Plaintiff purchased CCAs in the United States or

its territories at supra-competitive prices directly from one or more of the Defendants.

**B.**    **Defendants**

*1. Euclid Group*

16.    Defendant Euclid is an Ohio corporation with its primary place of business at 19215 Redwood Rd, Cleveland, Ohio 44110. Euclid has approximately twenty-eight (28) locations in North America, including twenty-one (21) locations in the United States, one of which is in this District.[13] During the Class Period, Euclid manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

17.    Defendant RPM is a Delaware corporation with its primary place of business at 2628 Pearl Road, Medina, Ohio 44256. During the Class Period, RPM manufactured and sold CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including Euclid.

18.    Euclid is a wholly owned subsidiary of RPM. RPM controls Euclid both generally and with respect to the conduct of Euclid in furtherance of the unlawful acts alleged in this Complaint.

19.    Euclid and RPM are collectively referred to herein as "Euclid Group."

*2. Master Builders Group*

20.    Defendant Cinven Ltd. is a British corporation with its primary place of business at 21 St. James's Square, London, SW1Y 4JZ, United Kingdom. Cinven Ltd. manufactures and sells CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including Cinven, Inc., MBSD, and MBSA.

21.    Defendant Cinven, Inc. is a New York corporation with its primary place of business at Tower 49, 12 East 49th Street, New York, NY 10017. Cinven, Inc. manufactures and

---

[13] *Locations,* The Euclid Group (accessed January 5, 2024), http://12.43.214.238/locations.

sells CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including MBSA. Defendants Cinven Ltd. and Cinven, Inc. are collectively referred to herein as "Cinven."

22.     Defendant Master Builders Solutions Deutschland GmbH ("MBSD") is a German corporation with its primary place of business at Glücksteinallee 43-45, 68163 Mannheim, Germany. During the Class Period, MBSD manufactured and sold CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including MBSA. Indeed, the CEO of MBSA, Borris Gorella, is the Managing Director of MBSD's parent company, Master Builders Solutions Holdings GmbH.

23.     Defendant Master Builders Solutions Admixtures U.S., LLC ("MBSA") is a Delaware corporation with its primary place of business at 23700 Chagrin Blvd., Beachwood, Ohio, 44122. MBSA has approximately three locations throughout North America, including two in the United States.[14] During the Class Period, MBSA manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

24.     MBSD and MBSA are wholly owned subsidiaries of Cinven. Cinven controls MBSD and MBSA both generally and with respect to the conduct of MBSD and MBSA in furtherance of the unlawful acts alleged in this Complaint.

25.     MBSD, MBSA, and Cinven are collectively referred to herein as "Master Builders Group."

### 3. Sika

26.     Defendant Sika AG is a Swiss corporation with its primary place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and sold CCAs around the World, including in the United States, directly and through its predecessors,

---

[14] *Master Builders Solutions is Present Around the Globe*, Master Builders Solutions (accessed January 5, 2024), https://www.master-builders-solutions.com/about-us/our-locations.

affiliates, and/or subsidiaries, including Defendant Sika Corporation.

27.     Defendant Sika Corporation is a New Jersey corporation with its primary place of business at 201 Polito Ave Lyndhurst, New Jersey, 07071. Sika Corporation has approximately thirty-six locations throughout North America, including twenty-eight in the United States and three in this District.[15] During the Class Period, Sika Corporation manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

28.     Sika Corporation is a wholly owned subsidiary of Sika AG. Sika AG controls Sika Corporation both generally and with respect to the conduct of Sika Corporation in furtherance of the unlawful acts alleged in this Complaint.

29.     Sika AG and Sika Corporation are collectively referred to herein as "Sika."

### 4. Saint-Gobain Group

30.     Defendant Compagnie de Saint-Gobain S.A. is a French corporation with its primary place of business at Tour Saint Gobain,12 Place De L Iris Courbevoie, Ile-De-France, 92400 France. During the Class Period, Saint-Gobain Group manufactured and sold CCAs around the World, including in the United States and its territories, directly and through its predecessors, affiliates, and/or subsidiaries, including Saint-Gobain North America, Chryso, and GCP.

31.     Defendant Saint-Gobain North America is a Pennsylvania corporation with its primary place of business at 20 Moores Rd., Malvern, Pennsylvania, 19355. Saint-Gobain North America has approximately 150 locations throughout North America, including 106 in the United States, four of which are in this District.[16] During the Class Period, Saint-Gobain North America manufactured and sold CCAs in the United States and its territories, directly and/or through its

---

[15] *Locations*, Sika USA (accessed January 5, 2024), https://usa.sika.com/en/about-us/sika-usa-locations.html.
[16] *Manufacturing Sites*, Saint-Gobain (accessed January 5, 2024), https://www.saint-gobain-northamerica.com/manufacturing-sites.

predecessors, affiliates, or subsidiaries.

32.     Defendant Chryso is a Michigan corporation with its primary place of business at 1611 Highway 276, Rockwall, TX 75032. With over 1,300 staff worldwide, Chryso has twenty-two foreign subsidiaries and serves customers in more than 100 countries, including four in the United States. During the Class Period, Chryso manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

33.     Defendant GCP is a Georgia corporation with its primary place of business at 2325 Lakeview Parkway, Suite 450, Alpharetta, GA 30009. During the Class Period, GCP manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

34.     Saint-Gobain North America, Chryso, and GCP are wholly owned subsidiaries of Compagnie de Saint-Gobain S.A., which controls Saint Gobain North America, Chryso, and GCP both generally and with respect to their conduct in furtherance of the unlawful acts alleged in this Complaint.

35.     Compagnie de Saint-Gobain S.A., Saint-Gobain North America, Chryso, Inc., and GCP Applied Technologies, Inc. are collectively referred to herein as "Saint-Gobain Group."

### 5. Doe Defendants

36.     Doe Defendants 1-10 are members of the price-fixing conspiracy alleged herein whose identities are presently unknown to Plaintiff. These include, among other entities, the various "industry bodies" referenced in the CMA's statement regarding its investigation. Plaintiff expects that the identity of these Doe Defendants will be revealed during discovery, at which point Plaintiff will seek leave to amend its complaint to add those entities in place of the Doe Defendants.

### C.     Agents and Unnamed Co-Conspirators

37.     The acts alleged against the Defendants in this Complaint were authorized,

ordered, or carried out by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

38.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

39.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

### A.    Relevant Market

40.     The CCAs that Defendants manufacture are critical inputs for cement, concrete, and mortar products, without which those products would lack the vital safety and performance functionalities on which American physical infrastructure depends. There are three primary products in which CCAs are used. Cement is a binding agent made from limestone and clay and is an ingredient in both concrete and mortar. Global cement production amounted to an approximate 4.1 billion tons in 2022.[17] Concrete is comprised of cement, sand, and gravel, and is a flexible material used in foundations, slabs, and masonry. As of 2021, 30 billion tons of concrete are used each year,[18] and it has been said to be the "single most widely used material in the world."[19] Mortar is comprised of cement and sand. Its primary application is as an adhering agent for prefabricated building components (e.g., bricks or cinder blocks).[20] Cement, concrete, and mortar are indispensable construction inputs in the United States.

---

[17] *Production volume of cement worldwide from 1995 to 2022,* Statista (Accessed January 5, 2024), https://www.statista.com/statistics/1087115/global-cement-production-volume/.
[18] *Concrete needs to lose its colossal carbon footprint*, Nature (September 28, 2021), https://www.nature.com/articles/d41586-021-02612-55.
[19] *The Concrete Conundrum*, Chemistry World, (March 2008), https://www.rsc.org/images/Construction_tcm18-114530.pdf.
[20] *The Difference Between Morter and Cement*, Sakrete, (accessed January 5, 2024), https://www.sakrete.com/blog/post/the-difference-between-mortar-and-cement.

41.     CCAs are used to enhance particular properties of cement, concrete, and mortar to allow for critical tailored construction applications. CCAs may accelerate or prolong set time, increase or decrease the amount of water required, enhance durability and strength, or enhance the ability of a material to set in extreme temperatures.[21] While a particular producer of CCAs might manufacture various CCAs, the applications of CCAs significantly differ from one to the next. As every type of CCA accomplishes a clear and separate function, purchasers of CCAs do not view them interchangeably.[22]

42.     In sum, CCAs are among the most crucial construction inputs for American infrastructure, including residential, commercial, and industrial applications, and are considered "necessary to improve concrete quality, controllability, faster or slower setting times and other modified properties to achieve specific building results."[23] For purchasers, there is no substitutable input.

43.     Plaintiffs and similarly situated individuals are purchasers of CCAs that operate in the construction and industrial sectors, including producers of ready-mixed concrete, shotcrete, and pre-cast concrete.

44.     In general, Defendants sell CCAs directly to suppliers of ready-mix concrete and masonry, as well as through distributors.

45.     The North America CCA market represents over $3 billion of the nearly $18 billion dollar global admixture market.[24] Within the North America CCA market, the United States

---

[21] *Chemical Admixtures*, PCA America's Cement Manufacturers (accessed January 5, 2024), https://www.cement.org/cement-concrete/concrete-materials/chemical-admixtures.
[22] Nick Gromicko, *Concrete Admixtures*, International Association of Certified Home Inspectors (accessed January 5, 2024), https://www.nachi.org/concrete-admixtures.htm.
[23] *Construction Chemicals Market Revenue to Cross $71.45Bn by 2028 at 5.8% CAGR with Concrete Admixtures Segment Driving Growth During 2022–2028*, The Insight Partners (July 21, 2023), https://www.globenewswire.com/en/news-release/2023/07/31/2714695/0/en/Construction-Chemicals-Market-Revenue-to-Cross-71-45Bn-by-2028-at-5-8-CAGR-with-Concrete-Admixtures-Segment-Driving-Growth-During-2022-2028-The-Insight-Partners.html.
[24] Priya Nagrale, *Global Concrete Admixtures Market Overview,* Market Research Future (January 2024), https://www.marketresearchfuture.com/reports/concrete-admixtures-market-1994.

represents "the largest market share and was the fastest growing market in the region."[25] It is estimated that the total CCA market in the United States was $3.1 billion in 2022.[26]

46.    Defendants manufacture and sell numerous CCAs in the United States and its territories, as well as around the World. A non-exhaustive list of representative products includes the following:

| Euclid Group | Chryso (Saint-Gobain) | GCP (Saint-Gobain) | Sika | Master Builders Group |
|---|---|---|---|---|
| Eucon Baracade | Chryso Air | Polarset | Chromix | MasterPel |
| Eucon Vandex | Chryso Dust | Daratard | SikaMultiAir | MasterCell |
| | Suppressant | | | |
| Eucon WRX | Chryso CI | Dry-Block | SikaControl | MasterX-Seed |
| Visctrol | Chryso Serenis | DaraFill | SikaTard-440 | MasterSet |
| Eucon Easy Fill | Chryso Tard | Darapel | SolaChrome | MasterMatrix |
| Accelguard 80 | Chryso Premia | Daraccel | ViscoCrete | MasterLife |
| Eucon Retarder | Chryso Plast | V-Mar | SikaRugasol | |
| Eucon Stasis | Chryso Fluid Optima | Terapave | SikaCem | |
| | | AEA | | |
| Plastol | Chryso PoreTite | Recover | SikaCem Extender | |
| Eucon Sureshot | | Eclipse | SikaSet | |
| | | Polarset | Chromix | |
| | | | Sika MultiAir-25 | |
| | | | Sika ViscoCrete | |
| | | | Sika Rugasol | |

47.    Defendants are the dominant manufacturers and sellers of CCAs worldwide, including in the United States and its territories. On information and belief, Plaintiff estimates Defendants represent between eighty to ninety percent of the U.S. market of CCAs in the United States.[27]

**B.    Market Forces Do Not Explain Defendants' Drastic Price Hikes During the Class Period**

48.    The average price of CCAs has dramatically increased throughout the Class

---

[25] *Id.*

[26] Anjumnisha S, Eswara P, *U.S. Admixtures for Concrete Market Size, Share, Competitive Landscape and Trend Analysis Report by Type and by Application,* Allied Market Research (November 2023), https://www.alliedmarketresearch.com/us-admixtures-for-concrete-market-A289350.

[27] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022).

Period.

49.    The surge in CCA pricing is aptly highlighted by the U.S. International Trade Commission. As Figure 1 shows, the value for imports of "Prepared Additives for Cements, Mortars or Concretes" remained nearly flat for the nine years prior to the Class Period, only to jump nearly 70% in the years since.



*Figure 1 – Customs Value/First Unit of Quantity (kilogram) for 2009 – 2022*

50.    Purchasers in the United States and its territories import CCAs directly from foreign Defendants (*e.g.*, Compagnie de Saint-Gobain S.A., Sika AG, and MBSD) and buy them from their domestic subsidiaries (*e.g.*, Sika Corp., Chryso, GCP, and MBSA).

51.    Throughout the Class Period, Defendants announced a series of price hikes.

52.    In early 2021, Saint-Gobain reported that a focus on "[u]pward trends in sales prices" led to a steady increase in the company's 2020 operating income.[28] The following year, Saint-Gobain Group attributed its sales growth to price increases during 2021, noting that "strong pricing agility and discipline" and "acceleration in prices in all segments" led to prices up "6.7%

---

[28] *FY 2020 Results and Outlook*, Saint-Gobain (February 26, 2021), Slide 22, https://www.saint-gobain.com/sites/saint-gobain.com/files/fy-2020-ang-a_0.pdf.

over the year versus 2020".[29] In 2023, Saint-Gobain reported a "[s]harp rise in operating income since 2018: up 14% per year on average" and said that it had enjoyed "record double-digit margin for the second consecutive year" as a result of "sound management of the price/cost spread."[30] Saint-Gobain's focus on rapid and consistent price increases was highlighted in an October 2021 press release, in which Saint-Gobain touted a nearly 20% price increase for CCAs in the Americas between 2019 and 2021.[31]

53.    In February 2019, a Sika executive confirmed the second price increase that year.[32] In April 2022, Sika CEO Thomas Hasler reported "we were able to implement consistent price adjustments" that led to "record sales in first quarter."[33] By the end of the year, Sika reported that "[b]y raising prices and generating efficiency gains along the value chain, Sika countered this situation and delivered a record EBIT."[34]

54.    In November 2020, Master Builders Group confirmed a price hike of 10% on CCAs,[35] and a 40% increase to surcharges little more than a year later.[36] In November 2021, GCP similarly announced a 10% price hike for customers in North America.[37] And in January 2022,

---

[29] *2021 Results and Outlook*, Saint-Gobain (February 25, 2022), Slide 17, https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/FY2021_ENG.pdf.

[30] *Recent Results and Outlook*, Saint-Gobain (April 2023), Slide 21, https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CA-T1-2023_FY-2022_ENG.pdf.

[31] *Press Release: Continued Dynamic Organic Growth in the Third Quarter*, Saint-Gobain (October 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[32] *Sika raises prices to counter jump in raw material* costs, Reuters (February 22. 2019), https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/.

[33] *Media Release: Strong Start to the Year-Sika Unveils Record Sales in First Quarter*, Sika (April 12, 2022), https://www.sika.com/content/dam/dms/corporate/media/glo-en-media-release-q1-results-12042022.pdf.

[34] *Sika Business Year 2022*, Sika at p. 147 (February 14, 2023), https://www.sika.com/content/dam/dms/corporate/media/glo-ar-2022-sika-business-year.pdf.

[35] *Master Builders Solutions to Increase Prices for Construction Chemicals*, Sika (Nov. 13, 2020), https://mbcc.sika.com/envn/.
about-us/news/price-increase-announcement.

[36] Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (July 20, 2021), https://www.negwer.com/Portals/0/Documents/Vendor%20News/2021%20Price%20Increases/2021_07_20_Master%20Builders%20Solutions%20Surcharge%20Letter_EN.pdf?ver=2021-07-21-080522-810.

[37] *GCP To Increase Admixture Prices 10%, Effective January 2022*, For Construction Pros.com (November 23, 2021), https://www.forconstructionpros.com/concrete/equipment-products/concrete-materials/news/21915798/gcp-to-increase-admixture-prices-10-effective-january#:~:text=GCP%20announced%20it%20is%20implementing,products%20effective%20January%201%2C%202022.

Master Builders again announced that it would raise its surcharges by 4%.[38]

55.     Euclid announced price increases in October of 2021, claiming the raise was due to supply shortages.[39] Shortly thereafter, RPM reported record sales and growth, noting that concrete admixtures were "leading the way."[40] In its 2022 annual report, RPM International's CEO Frank Sullivan reported "in the last 15 months alone, we've implemented multiple price increases, accounting for a 9.8% increase on average across the board."[41] While suggesting these increases were mandated by the "current inflationary environment," Sullivan also reported "record sales and profitability in FY 22" for its Construction Products Group, which includes CCAs.[42] Further, on repeated instances in 2023, RPM International reported record sales, noting "sales growth was led by pricing increases and strength in concrete admixture and repair products . . ."[43] When asked by an analyst on the Q4 2023 earnings call how RPM was able to significantly increase margin, Sullivan replied "[a]nd I think we held our pricing and held our discipline."[44]

56.     As Defendants themselves admitted, normal market forces cannot account for these price hikes. While several Defendants have attributed price increases to the elevated cost of raw materials, freight, and inflation, freight costs jumped only briefly during the Class Period, and, unlike CCA prices, have since returned to nearly pre-pandemic levels.[45] And the costs of other raw

---

[38] Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (January 14, 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

[39] *Euclid Chemical Announces Price Increase Due to Continued Supply Chain Shortages of Construction Materials*, PR Newswire (October 11, 2021), https://www.prnewswire.com/news-releases/euclid-chemical-announces-price-increase-due-to-continued-supply-chain-shortages-of-construction-materials-301397115.html.

[40] *RPM Reports Results for Fiscal 2021 Fourth Quarter and Full Year*, RPM International (July 26, 2021), https://www.rpminc.com/media/2871/4q21-earnings-release-final-072621-financials.pdf.

[41] *2022 Summary Annual Report,* RPM International, https://www.rpminc.com/media/3822/2022-summary-annual-report.pdf.

[42] *Id.*

[43] *Edited Transcripts: RPM.N- Q4 2023 RPM International Earnings Call,* (July 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf; *Edited Transcripts: RPM.N- Q3 2023 RPM International Earnings Call,* (April 6, 2023),https://www.rpminc.com/media/4675/rpm-q3-23-transcript.pdf.

[44] *Edited Transcripts: RPM.N- Q4 2023 RPM International Earnings Call,* (July 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf.

[45] *The Cass Freight Index: A Measure of North America Freight Volumes*, Cass Inferred Freight Rates January 2010 – November 2023, https://www.cassinfo.com/freight-audit-payment/cass-transportation-indexes/cass-freight-index.

material inputs for CCAs either fell dramatically after brief upticks, or actually decreased during the Class Period.

57.     Indeed, Defendants have acknowledged that market forces did not explain their price increases. Executives from several Defendants publicly stated during the Class Period that they intended to maintain price increases despite flagging inflation and only moderate, or in some cases decreased, input costs.

## C.     Defendants' Common Membership in Trade Organizations Facilitated Their Collusion

58.     In announcing the coordinated dawn raids, the Competition and Markets Authority stated that the anticompetitive conduct at issue included both companies supplying "chemical admixtures and additives" as well as "some industry bodies."[46] This is hardly surprising, given that Defendants share membership in a multitude of CCA trade associations around the World, including in the United States, which provided Defendants with ample opportunity to meet and conspire in furtherance of their agreement to fix prices for CCAs.

59.     Defendants Sika, Saint-Gobain Group, and Master Builders Group are members of the following shared trade associations: (a) the Belgian CCA trade association, FIPAH;[47] (b) the French CCA trade association, SYNAD;[48] (c) the Italian CCA trade association, ASSIAD;[49] (d) the Norwegian CCA trade association, NCCA;[50] (e) the Spanish CCA trade association, ANFAH;[51] (f) the Swedish CCA trade association, SACA;[52] (g) the Turkish CCA trade association, KUB;[53]

---

[46] Gov.UK, *Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry*, Oct. 17, 2023, https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry.
[47] FIPAH, Members, https://www.fipah.be/fr/membres/.
[48] Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.
[49] ASSIAD, The Structure,
https://www.assiad.it/LAssociazione/Lastruttura?__cf_chl_rt_tk=u7pLurzdoe4b4m7JWGOfds7HNRCC9lGE05zRT
EktZi4-1700142619-0-gaNycGzNChA.
[50] NCCA, https://ncca.no/.
[51] ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.
[52] SACA, Member Companies, https://www.saca.se/medlemmar.html.
[53] KUB, About Us, https://kub.org.tr/hakkimizda/.

and (h) the UK CCA trade association, CAA.[54] Euclid is also a member of KUB.[55] Each of these

trade associations also belongs to an umbrella CCA trade association: EFCA.

60.    **EFCA.** EFCA describes itself as "a partnership of 13 National Admixture

Associations, formed in 1984 in order to represent the interests of the industry."[56] EFCA's

membership "provides in excess of 80% of admixture sales within Europe and represents all the

major admixture manufacturers."[57]

61.    Currently, the EFCA Executive Board is comprised of President Gianluca

Bianchin, Vice Presidents Thomas Hirschi and Osman Ilgen, Sustainability Committee Chair

Nihal Kinnersley, and Technical Committee Chair Francesco Surico.[58] Thomas Hirschi has worked

at Sika since July of 2001 and has served as "Target Market Manager Concrete Waterproofing" for

the company since January of 2017.[59] Osman Ilgen was Managing Director at Chryso from March

of 2015 through September of 2023 and has been a Vice President at Saint-Gobain Group since

January of 2023.[60] He also currently serves as President of KUB.[61] Nihal Kinnersley has worked

as a Product Stewardship Manager at GCP since March of 2016 and as a Product Stewardship

Director at Saint-Gobain Group since July of 2023.[62]

62.    Other members of the ECFA Board include Kai Salo of Sika, Claude Le Fur, who

worked at Sika until July of 2021, and Suat Seven of Master Builders Group.[63]

63.    Members of the EFCA Technical Committee include Ian Ellis, who worked at

---

[54] Cement Admixtures Association, Members, https://www.admixtures.org.uk/members.

[55] KUB, About Us, https://kub.org.tr/hakkimizda/.

[56] EFCA, About Us, https://www.efca.info/about-us/.

[57] *Id*.

[58] EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

[59] Thomas Hirschi, LinkedIn Profile, https://www.linkedin.com/in/thomas-hirschi-01159b83/?originalSubdomain=ch.

[60] Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr.

[61] *Id*.

[62] Nihal Kinnersley, LinkedIn Profile, https://www.linkedin.com/in/nihal-kinnersley-ba506b22/?originalSubdomain=uk.

[63] EFCA, Committees, https://www.efca.info/efca-committees/; Kai Salo, LinkedIn Profile, https://www.linkedin.com/in/kai-salo-72384880/?originalSubdomain=fi; Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr; Suat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

Master Builders Group until July of 2022, Marko Kaisanlahti of Master Builders Group, Franz

Wombacher of Sika, Trond Solbo of Sika, Osman Tezel of Saint-Gobain Group, Jean-Philippe

Bigas of Saint-Gobain Group, and Robert Hurkmans of Saint-Gobain Group.[64]

64.    Members of the EFCA Environmental Committee (which is also referred to as

the Sustainability Committee) include Marko Kaisanlahti of Master Builders Group, Maxime Julliot of

Master Builders Group, Mark Schneider, who worked for Sika until October of 2022, Bjorn Stockmann of

Sika, Anders Larsson of Sika, and Osman Tezel of Saint-Gobain Group.[65]

65.    **FIPAH.** FIPAH's website declares that it was founded "with the aim of promoting

the common interests of the 'Concrete and Mortar Admixtures Industry.'"[66]

66.    **SYNDAD.** One of SYNAD's stated goals is to "to establish a relationship between

all market players." SYNAD representatives currently serving on EFCA committees include

Claude Le Fur, Jean-Philippe Bigas, and Maxime Julliot.[67] Claude Le Fur worked at Sika from

2008 through July of 2021, and his last role was "Manager of Business Development for Europe

South and Middle East."[68] Jean-Philippe Bigas began working for Chryso in 2006, and has served

as its "Technical Director in charge of regulatory aspects and sustainable development" since June

---

[64] EFCA, Committees, https://www.efca.info/efca-committees/; Ian Ellis, LinkedIn Profile,
https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk; Marko Kaisanlahti, LinkedIn Profile,
https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Franz Wombacher, LinkedIn Profile,
https://www.linkedin.com/in/franz-wombacher-9888b941/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile,
https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Sika Norway, Technical Department/Environment/QEHS,
https://nor.sika.com/no/teknisk-avdeling.html; Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-
philippebigas-
658a07b5/?originalSubdomain=fr; CHRYSO, Saint-Gobain Weber Beamix Enlarges its Offering in the Netherlands with
Weber Cemfloor Screed and Chryso Concrete Admixtures (June 9, 2023), https://www.chryso.com/news/saint-gobain-
weberbeamix-
enlarges-its-offering-in-the-netherlands-with-weber-cemfloor-screed-and-chryso-concrete-admixtures/.
[65] EFCA, Committees, https://www.efca.info/efca-committees/; Marko Kaisanlahti, LinkedIn Profile,
https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Mark Schneider, LinkedIn Profile,
https://www.linkedin.com/in/mark-schneider-157a57108/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile,
https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Bjorn Stockmann, LinkedIn Profile,
https://www.linkedin.com/in/bj%C3%B8rn-stockmann-52346034/?originalSubdomain=no; Andres Larsson, LinkedIn Profile,
https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se; Master Builders Solutions, Meet Our Team,
https://masterfiber.master-builders-solutions.com/contact/contact.
[66] FIPAH, Home, https://www.fipah.be/nl.
[67] EFCA, Committees, https://www.efca.info/efca-committees/.
[68] Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr.

of 2023.[69] Maxime Julliot works as a Market Manager at Master Builders Group.[70]

67.    **ASSIAD.** Part of ASSIAD's mission is to "bring together the interested companies or groups thereof to discuss issues of common interest." The ASSIAD website lists eleven "Consiglio Generale" members, including Leonardo Messaggi of Sika (President), Mario Casali of GCP, Donato Luciano of Chryso, and Roberto Spaggiari of Master Builders Group.[71] On April 9, 2021, ASSIAD announced four new members of the ASSIAD Board, including Donato Luciano of Master Builders Group, Jean Mascaro of Chryso, and Leonardo Messaggi of Sika.[72]

68.    On July 21, 2023, ASSIAD announced that Leonardo Messaggi of Sika had been elected President of ASSIAD for the period from 2023 to 2027.[73] Leonardo Messaggi has worked for Sika since 2016 and currently serves as "Target Market Manager for Concrete & Industrial Flooring."[74] In addition, Paolo Novello of Chryso serves as the Vice President of ASSIAD.[75]

69.    On October 4, 2023, ASSIAD announced the creation of a new Technical Evolution Committee made up of thirteen members, including Fabrizio Avallone and Cristiano Cereda of Sika, Mario Casali and Pietro Massinari of Chryso, and Ivana Torresan of Master Builders Group.[76]

---

[69] Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippe-bigas-658a07b5/?originalSubdomain=fr.

[70] Master Builders Solutions, Meet Our Team, https://masterfiber.master-builders-solutions.com/contact/contact.

[71] ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[72] Press Release, ASSIAD, Two New Additions to the General Council (Apr. 9, 2021), https://www.assiad.it/News/duenuovi-ingressi-nel-consiglio-generale.

[73] Press Release, ASSIAD, ASSIAD Announces the Election of the New President and Vice Presidents for the Four-Year period 2023-2027 (July 21, 2023), https://www.assiad.it/News/assiad-annuncia-lelezione-del-nuovo-presidente-e-deivicepresidenti-per-il-quadriennio-2023-2027.

[74] Leonardo Messaggi, LinkedIn Profile, https://www.linkedin.com/in/leonardo-messaggi-5b949670/?locale=en_US.

[75] ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad; Ingenio, Concrete and Construction Post-Covid: Companies are Ready to Adopt the "Circular Economy" (July 29, 2020); https://www.ingenio-web.it/articoli/calcestruzzo-e-edilizia-post-covid-le-imprese-sono-pronte-ad-adottare-la-circular-economy/; Arketipo, ICARE Cement Technology by Chryso (Aug. 28, 2020), https://www.arketipomagazine.it/tecnologia-per-il-cementoicare-by-chryso/; Paolo Novello, LinkedIn Profile, https://www.linkedin.com/in/paolo-novello-bab315b2/?originalSubdomain=it.

[76] ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad.

70.     On October 5, 2023, Messaggi announced that the thirteen members of the new Technical Evolution Committee would participate in roundtables at the first "General States of Concrete Technology" at SAIE Bari, an industry meeting, in October of 2023.[77] Sika, Chryso, GCP, and Master Builders Group were all scheduled to participate as "exhibitors" at this meeting.[78]

71.     **NCCA.** NCCA representatives currently serving on EFCA committees include, Trond Solbo and Bjorn Stockmann, who both work for Sika.[79] As explained herein, these Sika employees met with executives from other Defendants in their roles as EFCA committee members.

72.     **ANFAH.** ANFAH members represent "around 90% of the admixtures used in Spain."[80]

73.     **SACA.** SACA representatives currently serving on EFCA committees include Anders Larsson, who works for Sika.[81] As explained herein, Anders Larsson met with executives from other Defendants in his role as an EFCA committee member.

74.     **KUB.** KUB boasts that it "dominates 80% of the Turkish market," which itself makes up 40% of the total concrete admixture market in Europe.[82] On March 13, 2020, KUB announced that Turgay Ozkun, a General Manager at Sika, had been elected as Chairman of the Board. At the same time, Osman Ilgen, a Vice President with Saint-Gobain Group, was elected as Vice President of the Board, and Suat Seven of Master Builders Group was also elected to the

---

[77] Ingenio, ASSIAD Among the Protagonists at the General States on Concrete Technology at SAIE Bari 2023 (Oct. 5, 2023), https://www.ingenio-web.it/articoli/assiad-tra-i-protagonisti-agli-stati-generali-della-tecnologia-del-calcestruzzo-al-saiebari-2023.

[78] *Id.*

[79] SAIE, Exhibitor Preview, https://eventi.senaf.it/previewespositori.php?CSRFName=CSRFGuard_330546167&CSRFToken=7908882XTY66GK7IT8RA8XB7KGFK67NWMU5BCCDDP5O0T8VC1XGIJSJ3T8EOOB7B&rag_soc=master+builders&rag_soc_inizia=&settore=&ide=1816&action=reimposta.

[80] EFCA, Spain – ANFAH, https://www.efca.info/efca-members/spain-anfah/.

[81] EFCA, Committees, https://www.efca.info/efca-committees; Anders Larsson, LinkedIn Profile, https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se.

[82] KUB, About Us, https://kub.org.tr/hakkimizda/.

Board.[83] Osman Ilgen currently serves as both President of KUB and Vice President of EFCA.[84]

75.    **CAA.** Two Master Builders Group executives currently hold leadership positions in the CAA: Chris Fletcher, a Master Builders Group Managing Director, is Chairman of the CAA Council, which "[e]stablishes and implements policy, promotes admixture use, [and] manages [CAA's] committees, task groups, and finances," while Ian Ellis, formerly a Master Builders Group Technical Services Manager, is Chairman of the CAA Technical Committee, which "[s]upports work on UK and European Standards, Codes, and Certification [and] [p]romotes improvements in technical information, quality control, and level of technical support provided by CAA members."[85] Ian Ellis is also a member of the EFCA Technical Committee.[86]

76.    **NRMCA:** The NRMCA claims it is "the leading industry advocate" for ready-mix concrete in the United States.[87] Its membership is made up of ready-mix concrete producers and their suppliers, including "providers of cement, admixtures, additives, colors, etc." with one testimonial claiming "[w]hen you make products that are used in concrete and concrete production, the obvious organization to join is NRMCA."[88] Among other activities, the NRMCA hosts the NRMCA Annual Convention, and is the principal sponsor of CONEXPO-CON/AGG, the "largest exposition ever held in the Western Hemisphere for the construction, aggregates and ready mixed concrete industries."[89] Defendants Euclid Group, Sika, and Master Builders Solutions are the "Super Sponsors" for NRMCA.[90]

---

[83] EFCA, New KUB President, https://www.efca.info/2020/03/13/new-kub-president/; Stuat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

[84] Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

[85] Cement Admixtures Association, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/; Chris Fletcher, LinkedIn Profile, https://www.linkedin.com/in/chris-fletcher-84685137/?originalSubdomain=uk; Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk.

[86] EFCA, Committees, https://www.efca.info/efca-committees/.

[87] NRMCA, About NRMCA, https://www.nrmca.org/about-nrmca.

[88] NRMCA, Join, https://www.nrmca.org/join.

[89] NRMCA, About NRMCA, https://www.nrmca.org/about-nrmca.

[90] NRMCA, NRMMCA Sponsors, https://www.nrmca.org/home/sponsors.

D.   **Market Conditions for CCAs Are Highly Conducive to Collusion Among Defendants**

77.     The CCA market structure is characterized by numerous "plus factors" that render the industry susceptible to collusion, such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) inelastic consumer demand, (3) market concentration of sellers, (4) an unconcentrated market of buyers, (5) exchanges of competitively sensitive information among horizontal competitors, and (6) numerous opportunities to collude.

1.  *There are high barriers to entry.*

78.     Typically, in a market where market participants are colluding to generate supra-competitive prices, the excess profits generated would incentivize competitors to enter the market and drive prices down. However, in markets where there are high barriers to entry, like the market for CCAs, new competitors are less likely to enter the market. Thus, entry barriers help to facilitate the formation and maintenance of a cartel. Manufacturers of CCAs face significant entry barriers, such as significant startup and scaling costs, regulatory compliance, high input costs, labor costs, and high cost of research and development to create and introduce new products to the marketplace. Additionally, sellers of the raw materials necessary to manufacture CCAs favor the larger, entrenched manufacturers. Furthermore, any potential newcomer would have to upend the existing relations between the large CCAs and their customers. Thus, new entrants into the market for CCAs are unlikely to be a real threat to cartel pricing.

79.     These high barriers to entry are amplified by the difficulty purchasers of CCAs have in switching between manufacturers once a relationship is in place. Smaller suppliers of CCAs cannot quickly build up their scale and capacity for customers who wish to switch providers. Additionally, supply contracts in this industry typically have a term of one to three years, presenting purchasers of CCAs with additional switching costs if they wish to replace their

suppliers.[91]

### 2. There is inelastic consumer demand for CCAs.

80.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

81.    There is a lack of substitute goods for CCAs, and CCAs are necessary for a variety of specific construction needs. The unique properties of CCAs allow for uses of cement, concrete, and mortar that are impossible without chemical admixtures.[92] The lack of substitutable products for CCAs, and the necessity for their use in a wide range of construction products, all result in inelasticity of demand for CCAs.

82.    Additionally, CCAs typically make up only about one to seven percent of the overall cost of the finished products in which they are used.[93] As a result, even a major shift in the prices of CCAs is unlikely to have a major impact on buyers' usage of them.

83.    As price increases for CCAs do not in general reduce the purchase of CCAs or the revenue that Defendants make on their sales of CCAs, the CCA market is highly susceptible to collusion.

### 3. The market for CCAs manufacturers is highly concentrated.

84.    Towards the end of 2018, the admixtures market saw a "wave of consolidation"

---

[91] CMA, Phase 2 Provisional Findings, ¶6.50 (Oct. 25, 2022).
[92] "Sika's product offering is…essential to their end users…" (VY Tyndall Global Select Fund Commentary, October 2019, p. 4); see also 2022.10.25_Sika-MBCC_CMA Initial Report at ¶ 6.30-6.31.
[93] CMA, Phase 2 Provisional Findings, ¶6.32 (Oct. 25, 2022).

which lead to substantial supply side concentration in the CCA market.[94] This wave of merger activity was not unnoticed in the industry. Following Sika's June 2023 purchase of MBCC, one industry expert noted the move as "continuing a global concrete admixtures transformation that began with 2021-22 Saint-Gobain Group deals for Chyrso Group and GCP Applied Technologies."[95]

85.    Defendants' aggressive acquisition of firms has resulted in substantial supply-side concentration in the CCA market.[96] Examples of this M&A activity include the Chryso Group's acquisitions of Euromodel and Chemtec Admixtures Limited in October of 2018,[97] Chryso Group's purchase of Ruredil in June of 2018,[98] Sika's purchase of Parex in May of 2019,[99] Chryso Groups Purchase of Aptex in October of 2020,[100]  the sale of BASF's CCAs business to Lone Star Funds which was announced in December of 2019, which was sold to Sika less than a year later,[101] and the purchase of GCP Applied Technologies by Saint-Gobain in 2021.[102]

86.    The Euclid Group also sought to consolidate its holding in the CCA market. In November of 2021, RPM acquired J.W. Brett Inc. d/b/a Brett Admixtures, and in April of 2022, RPM acquired Chryso's North American cement grinding aids and additives business from Saint-

[94] *Superplasticizer Market Trends*,  Nexant (April 2019), https://www.nexanteca.com/sites/default/files/Nexant%20-%20Superplasticiser%20Market%20Trends%20-%20Blog%2008-Apr-2019_0.pdf.
[95] *Sika Closes Master Builders Deal With Former Chryso Underwriter*, Concrete Products (June 15, 2023), https://concreteproducts.com/index.php/2023/06/15/sika-closes-master-builders-deal-with-former-chryso-underwriter.
[96] Duane Dickson, *The future of chemicals and advanced materials in buildings and construction: Breaking away from the past*, Deloitte (2019), https://www2.deloitte.com/content/dam/Deloitte/global/Documents/Energy-and-Resources/gx-future-of-chemicals-brochure.pdf.
[97] *Superplasticizer Market Trends*, Nexant (April 2019), https://www.nexanteca.com/sites/default/files/Nexant%20-%20Superplasticiser%20Market%20Trends%20-%20Blog%2008-Apr-2019_0.pdf.
[98] *Id*.
[99] *Sika Completes Acquisition of Parex,* Sika (May 23, 2019), https://gcc.sika.com/en/media/media-releases/2019/sika-completes-acquisition-of-parex.html.
[100] *Chryso Strengthens its Presence in Morocco with Aptex*, Chryso Saint-Gobain (October 15, 2020), https://www.chryso.com/news/chryso-strengthens-its-presence-in-morocco-with-aptex/.
[101] *Lone Star Funds to Acquire Master Builders,* Concrete Construction (December 27, 2019), https://www.concreteconstruction.net/products/concrete-construction-materials/lone-star-funds-to-acquire-master-builders_c.
[102] *Saint-Gobain To Acquire GCP Applied Technologies In $2.3 Bln Cash Deal - Quick Facts,* RTT News (December 6, 2021), https://www.nasdaq.com/articles/saint-gobain-to-acquire-gcp-applied-technologies-in-%242.3-bln-cash-deal-quick-facts.

Gobain Group.[103]

87.　　At least one Defendant has made it clear that this flurry of acquisitions will continue. Sika's CFO and Board Member Arian Widmer stated during an Earnings Call on August 3, 2023 that Sika was not "changing in strategy or slowing down our acquisition pipeline and [it] remains quite robust and there will be more to come."[104]

4.　*The market of CCA purchasers is unconcentrated.*

88.　　Buyers of CCAs are unconcentrated with nearly 9,000 concrete and cement product manufacturing companies in the United States alone.[105]

89.　　The purchasing firms that comprise the demand side are mostly independent. Each purchaser, therefore, comprises only a small portion of a Defendant's business. This incentivizes Defendants to abide by the conspiracy's terms rather than make price concessions to a lone purchaser, since foregoing sales to a single purchaser represents an insignificant loss compared to the consequences of violating the conspiracy.

5.　*Regular merger activity afforded Defendants opportunities to exchange competitively sensitive information.*

90.　　Mergers between Defendants allowed them access to each other's confidential information. The major players have repeatedly engaged in various horizonal mergers. These deals gave Defendants numerous opportunities to exchange potentially sensitive information.

91.　　For example, Saint-Gobain attempted to buy a controlling stake in Sika starting around 2014, which lead to a prolonged court battle where Sika investors successfully blocked the merger. In 2018, a deal was struck that resulted in Saint-Gobain owning 10.75% of Sika's shares.[106]

---

[103] RPM International, Proxy Statement (Aug. 24, 2022), https://www.rpminc.com/media/3815/proxy-statement.pdf.
[104] Sika AG Q2 2023 Earnings Call Transcript, (Aug. 3, 2023), https://strike.market/stocks/SXYAY/earnings-call-transcripts/221804 (accessed January 5, 2024).
[105] *3273: Cement and Concrete product manufacturing*, United States Census Bureau (accessed January 5, 2024) https://data.census.gov/profile/3273_-_Cement_and_concrete_product_manufacturing?g=010XX00US&n=3273.
[106] John Revill, *Saint-Gobain sells Sika stake, formally ending bitter takeover battle,* Reuters (May 27, 2020), https://www.reuters.com/article/sika-m-a-saintgobain-idINKBN2331JZ.

92.    Cinven sold Chryso Group to Saint-Gobain in 2021.[107]

93.    Beginning in late 2018, Sika AG expressed an interest in acquiring Master Builders Group, which at the time, was owned by BASF.[108] Sika AG initially abandoned its interest in Master Builders Group because it did not believe a complete takeover of the company would be possible because of antitrust concerns by regulators.[109] In December 2019, BASF announced it would sell Master Builders Group to the hedge fund Lone Star for $3.5 billion.[110] The sale was finalized in the third quarter of 2020.[111]

94.    However, less than a year later, in 2021, Sika announced it had acquired Master Builders Group for $5.9 billion, almost double what Lone Star had paid for it only one year earlier. In order to receive regulatory approval, Sika agreed to split MBCC Group's assets. The England, US, Canada, Europe, Australia, and New Zealand assets were split off and sold to another Defendant, Cinven, in 2023, while Sika retained Master Builders Group's assets in the rest of the world.[112]

> 6.    *There were numerous opportunities for Defendants to collude.*

95.    The DOJ notes that competitors who "know each other well through social connections, trade associations, [and] legitimate business contacts" are more likely to collude.

---

[107] *Saint-Gobain Enters into an Agreement to Acquire Chryso, A Leading Global Player in Construction Chemicals*, Saint-Gobain (May 20, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/20210520_chryso_cp_va.pdf.

[108] John Revill, *Sika interested in parts of BASF's construction chemicals business,* Reuters (February 22, 2019), https://www.reuters.com/article/us-sika-ceo-basf/sika-interested-in-parts-of-basfs-construction-chemicals-business-idUSKCN1QB1CP/.

[109] *Sika CEO rules out deal for whole BASF construction chemical business,* Reuters (January 8, 2019), https://www.reuters.com/article/brief-sika-ceo-rules-out-deal-for-whole/brief-sika-ceo-rules-out-deal-for-whole-basf-construction-chemical-business-idUKZ8N1UN017/.

[110] Paul O'Donnell, *Dallas' Lone Star Funds Buy German Chemicals Business for $3.5 Billion*, The Dallas Morning News, (Dec. 21, 2019), https://www.dallasnews.com/business/local-companies/2019/12/21/dallas-lone-star-funds-buys-german-chemicals-business-for-35-billion.

[111] BFT International, *BASF Construction Chemicals Business is Now MBCC Group* (accessed January 5, 2024), https://www.bft-international.com/en/artikel/bft_BASF_Construction_Chemicals_business_is_now_MBCC_Group-3582789.html.

[112] *Sika to Sell MBCC Group's Chemical Admixture Assets to Cinven,* ASI Adhesives & Sealants (March 27, 2023), https://www.adhesivesmag.com/articles/100079-sika-to-sell-mbcc-groups-chemical-admixture-assets-to-cinven.

96.     As noted supra, Defendants are deeply interconnected through their shared membership in foreign and American trade associations. Additionally, Defendants have had the opportunity to further strengthen connections with direct competitors through merger activity.

### E.     Antitrust Investigations into Defendants' Conduct Corroborate the Existence of a Conspiracy

97.     On October 17, 2023, the European Commission issued a press release stating that, pursuant to its authority under Article 101 of the Treaty on the Functioning of the European Union, it had carried out surprise investigations at several construction chemical firms suspected of cartel conduct.[113]

98.     The European Commission also confirmed the investigation was coordinated with the UK Competition and Markets Authority, the Turkish Competition Authority, and the DOJ, and that the EC was accompanied by its counterparts from the national competition authorities of the European Union Member States where inspections were conducted.[114]

99.     That same day, the CMA and TCA confirmed their participation in the investigation into anticompetitive conduct in the CCAs sector,[115] and Sika, Saint-Gobain Group, and Master Builders Group confirmed their cooperation with the investigation.[116]

100.     On October 18, 2023, Saint-Gobain Group confirmed it was under investigation: "We can confirm that Saint-Gobain is aware of competition law investigations and cooperating with these investigations."[117] That same day, Master Builders Group also confirmed the

---

[113] *Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector,* European Commission (October 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

[114] *Id.*

[115] *CMA launches Investigation into the Supply of Chemicals for Use in Construction Industry*, Competition and Markets Authority (October 17, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-the-supply-of-chemicals-for-use-in-construction-industry; Michal Kocon, *Antitrust Investigations into Supply of Construction Chemicals,* K&L Gates (December 18, 2023), https://www.klgates.com/Antitrust-Investigations-Into-Supply-of-Construction-Chemicals-12-18-2023#:~:text=On%2017%20October%202023%2C%20the,industry%2C%20such%20as%20admixtures%20and.

[116] *European Antitrust Bimonthly Bulletin – September/October 2023,* JD Supra (November 6, 2023), https://www.jdsupra.com/legalnews/european-antitrust-bimonthly-bulletin-8666774/.

[117] Foo Yun Chee, *St. Gobain Says Cooperating in EU Probe into Construction Chemicals Cartel*, Reuters, Oct. 18, 2023, https://www.nasdaq.com/articles/st-gobain-says-cooperating-in-eu-probe-into-construction-chemicals-cartel.

investigation by the EC.[118]

101.    On October 19, 2023, Sika confirmed the investigation in a statement to Construction News ("CN"): Sika confirmed to CN that inspections had taken place into "suspected antitrust irregularities in the area of additives for concrete and cement."[119]

102.    The inspections by the EC were not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[120]

103.    The same is true for the TCA. Earlier this year, the Turkish Constitutional Court, the highest legal body for constitutional review in Turkey, held that the TCA may conduct a dawn raid after first obtaining a search warrant from a Turkish criminal court.

**F.    Defendants Fraudulently Concealed Their Conduct**

104.    Plaintiff had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, October 17, 2023, when the EC announced its investigation into the Defendants and stated that it was coordinating with the TCA, CMA, and DOJ. As a result, Plaintiff did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to October 17, 2023, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for CCAs.

---

[118] Nicholas Hirst and Lewis Crofts, *Saint-Gobain, Sika, MBS Are Cooperating With Antitrust Probes Into Construction Chemicals (Update)* mlex (Updated Oct. 18, 2023).

[119] Jonathan Knott, *Competition Regulators Probe Concrete Additive Firms*, Construction News, Oct. 19, 2023, https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023.

[120] Case No. T-135/09, Nexans France SAS v. Comm'n, 2012 E.C.R. 43.

105.    Therefore, the statute of limitations on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

106.    Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct alleged herein secret from customers and government authorities. Plaintiff reasonably believed it was purchasing CCAs in a competitive industry.

107.    Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. For example, each Defendant has a "Code of Conduct" that appears to prohibit exactly the type of conduct they engaged in here.[179] Additionally, as alleged in paragraphs 49-57, *supra*, Defendants falsely attributed price increases to increased input costs during the Class Period.

108.    Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff did not learn or discover the operative facts giving rise to its claims until October 17, 2023. No information, actual or constructive, was ever made available to Plaintiff that would have led a reasonably diligent person to investigate whether a conspiracy in the market for CCAs existed prior to October 17, 2023.

109.    Moreover, because Plaintiff could not have discovered the existence of its claims prior to October 17, 2023, Plaintiff's claims did not accrue until that date.

## CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

All persons and entities in the United States and its territories who purchased CCAs directly from any of the Defendants or their subsidiaries or affiliates during the period beginning no later than May 11, 2018 until the date on which a class is certified in this case. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators, and the court and its staff.

111.    ***Numerosity.*** While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

112.    ***Commonality.*** Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of CCAs in the United States and its territories;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f)    The effect of the alleged conspiracy on the price of CCAs during the Class

Period;

(g)     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(h)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(i)     The appropriate class-wide measure of damages.

113.    *Typicality.* Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and its undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for CCAs from Defendants and/or their co-conspirators.

114.    *Adequacy.* Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

115.    *Predominance.* The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

116.    *Superiority.* Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for

claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

117.    Billions of dollars of transactions in CCAs are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

118.    Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

119.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for CCAs in the United States.

120.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of CCAs sold in the United States, the prices of CCAs would have been determined by a competitive, efficient market.

## ANTITRUST INJURY

121.    Defendants' antitrust conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to the pricing of CCAs;

(b)    The prices of CCAs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of CCAs have been deprived of the benefits of free and open competition; and

(d)     Purchasers of CCAs paid artificially inflated prices.

122.     The purpose of the conspiratorial and unlawful conduct of Defendants and their co- conspirators was to fix, raise, stabilize and/or maintain the price of CCAs.

123.     The precise amount of the overcharge impacting the prices of CCAs paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

124.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for CCAs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLAIM

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

125.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

126.     From at least May 11, 2018 until the date on which any Class is certified, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to CCAs in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

127.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for CCAs, including surcharges on CCAs, in the United States and its territories.

128.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including the following:

      (a)     exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs, sold in the United States and its territories;

      (b)     participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs, sold in the United States and its territories; and

      (c)     participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

129.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs.

130.     Defendants' conspiracy had the following effects, among others:

      (a)     Price competition in the market for CCAs has been restrained, suppressed, and/or eliminated;

      (b)     Prices for CCAs, including surcharges on CCAs, provided by Defendants and their co-conspirators have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

      (c)     Plaintiff and members of the Class who purchased CCAs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

131.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for CCAs purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

132.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

133.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      The Court adjudge and decree that the acts of Defendants are illegal and unlawful, and that the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators have been a per se violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or

effect;

D.      That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, and pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 12, 2024

*/s/ Dianne M. Nast*
Dianne M. Nast
Daniel N. Gallucci
Michele S. Burkholder
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com
dgallucci@nastlaw.com
mburkholder@nastlaw.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Matt Jacobs
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
mjacobs@gustafsongluek.com

Christopher V. Le
Joshua Q. Callister
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
cle@boiesbattin.com
jcallister@boiesbattin.com

Simon B. Paris
Patrick Howard
**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 575-3985
sparis@smbb.com
phoward@smbb.com

Michael J. Boni
Joshua D. Snyder
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com

David M. Cialkowski
Ian F. McFarland
Zachary J. Freese
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com
zachary.freese@zimmreed.com

*Counsel for Plaintiff and the Putative Class*